# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

DEANDRE WARREN,

    Defendant.

No. 18-CR-82-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

_____

## *I. INTRODUCTION*

The matter now before me is Defendant's Motion to Suppress Evidence. (Doc. 10.) On August, 22, 2018, the Grand Jury charged Defendant with Possession with Intent to Distribute a Controlled Substance Within 1000 Feet of a School. (Doc. 2.) The charge arose from an incident that occurred behind a private residence on August 4, 2018. At the time of the incident, Defendant was a passenger in a car parked in a driveway off an alley in Cedar Rapids, Iowa.

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation. On October 12, 2018, I held an evidentiary hearing on Defendant's motion. The Government called the following witnesses:

- Cedar Rapids, Iowa Police Officer Alexander Haas
- Cedar Rapids, Iowa Police Officer Ryan Harrelson

- Cedar Rapids, Iowa Police Officer Amy Schuman
- Cedar Rapids, Iowa Police Officer Benjamin Otis

Defendant called the following witness:

- Investigator Tina M. Debban

For the following reasons, I respectfully recommend that the Court **deny Defendant's Motion to Suppress.**

## II. FINDINGS OF FACT

At approximately 8:40 p.m. on August 4, 2018, Cedar Rapids Police Officers Alexander Haas and Ryan Harrelson responded to an anonymous complaint about noise from inside the house located at 1032 9th Street S.E., Cedar Rapids ("the residence"). The officers parked on 9th Street in front of the residence. When the officers arrived, all was quiet. Both officers were in uniform and wore utility belts that held, among other things, their firearms. Neither Haas nor Harrelson wore a body camera, although there were three cameras in their squad car that could pick up three different views of scenes, and microphones that picked up each officer's conversation. The microphones turn on automatically when the lights on top of the squad car are activated and they could be manually turned on at any time by the officers. The lights on top of the squad car were never turned on during the events described below.

The officers testified that noise complaints are common and it is not unusual for the noise to have ceased by the time officers arrive. When that happens, Hass's and Harrelson's usual procedure is to walk around the immediate area to look for the source of the noise. On this occasion, Officer Harrelson knocked on the front door of the residence to speak to the occupants, while Officer Haas went to the back of the residence to see if he could find the source of the noise.[1]

---

[1] Officer Harrelson spoke to someone inside the house who refused to open the door, but who told Harrelson that he did not make the noise complaint.

When Haas entered the back yard, he saw a car parked in the driveway of the residence, and thought that the car might have been the source of the noise or that it might have been either arriving at, or leaving from, a party there. The car was parked off the traveled portion of the alley, facing toward the residence and could not be driven away without backing up. Because it was dark,[2] and the car's headlights shone into Haas's eyes, he could not see who was in the car. Haas did see both of the driver's hands hanging out of the driver's side window. Haas thought this behavior was suspicious because there was no reason for the driver to have his hands in that position. Haas testified that the driver said he "did not have any weapons on his person," which made Haas think it was possible there were weapons inside the car. Haas told the driver of the car that he was there because of a noise complaint, and asked the people in the car what they were doing there. Haas did not have his microphone turned on at this point, so this exchange was not recorded. Haas turned on his microphone 20-30 seconds after he first encountered the occupants of the car. Haas's recording starts while he is asking the driver for identification. (Gov. Ex. 1 at 8:51:00 (Mic. 1).)

The person behind the wheel, Cedric Jenkins, told Haas that he and his passengers had just arrived at the residence to pick up another person. Haas asked Jenkins to identify himself, and Jenkins stated that he had no driver's license or valid I.D. Haas asked Jenkins how he arrived at the residence, and Jenkins admitted that he had driven there. Haas then asked Jenkins to step out of the car so he could continue to verify Jenkins's identification. Haas testified that at that point, he was treating his questioning of Jenkins

---

[2] The officers' testimony varies on how dark it was when the relevant events occurred. Officer Haas testified that it was "dark" and that he was using his flashlight. Officer Harrelson testified that is was "dusk" and "getting dark," but that he could see with his flashlight. Officer Otis testified that it was "pitch black" and that he used his flashlight. Officer Schuman testified that she did not recall how dark it was. After viewing Government's Exhibit 1 (the squad car recordings) and Defendant's Exhibit B, I find that it was at least dusk at the beginning of the encounter, and quickly became fully dark.

as a "traffic stop" and an investigation into whether Jenkins had illegally driven a car that night. Haas dealt almost exclusively with Jenkins from this point on. Fifty-three minutes into the encounter, Haas was still trying to verify Jenkins's identification. (*Id.* at 9:43:50 (Mic. 1).)

Defendant Deandre Warren was in the front passenger seat and two women were in the back seat of the car. When Haas told Jenkins to get out of the car, Defendant also tried to exit the car. Haas said, "Sir, can you just stay in there for me, please?" and Defendant complied. (*Id.* at 8:51:21 (Mic. 1).) At this point, Haas put out a call on his radio to all available officers and the dispatcher informing them he was in back of the residence with four subjects. Approximately 40 to 50 seconds passed between when Haas first encountered the car and when he told Defendant to stay in the car.

When Harrelson heard Haas's call, he walked to the back of the residence to offer assistance. Harrelson then explained to the passengers in the car that he and Haas were responding to a noise complaint. Harrelson stood by the rear passenger-side door of the car because that position gave him a good view of the whole car. When Harrelson arrived, he noticed a "faint odor of marijuana emanating from the vehicle." People in the car started smoking cigarettes, which, based on his training and experience, Harrelson believed was done to mask the odor of marijuana.[3] Harrelson began identifying the passengers. Officer Benjamin Otis arrived at the scene less than two minutes after Harrelson and began speaking to Defendant.[4] (*Id.* at 8:52:19-8:54:05 (Mic.1).) Otis stood by Defendant's door and spoke to him through the open window.

---

[3] Haas never smelled marijuana coming from the car, but said he had a cold that night. (Gov. Ex. 1 at 9:13:45, 9:30:35 (Mic. 1).)

[4] Around this time, Harrelson and Haas became aware from dispatch that there was a no-contact order between Defendant and one of the woman in the back seat. When officers become aware that someone might be violating such an order, they are required to hold that person until they can confirm that a violation is occurring. If the person is in violation of the order, officers

4

Otis did not smell marijuana, but did smell cigarette smoke, which he also believed was a way people try to mask the odor of marijuana. Otis found Defendant to be cooperative, but nervous. Otis allowed Defendant to reach into the glove compartment for a cigarette. However, when Defendant appeared to reach under his left leg, Otis shined his flashlight on Defendant's hands, and Defendant stopped this motion. Otis then shined his flashlight down the inside of the front passenger door, and saw a bag of marijuana sticking out from under the passenger seat. Defendant was then removed from the car approximately seven-and-half minutes after Haas told him to stay in the car. (*Id.* at 8:58:48 (Mic. 2).) The area around where Defendant had been sitting was searched. The officers confirmed that the bag under the seat contained marijuana. Officers also found another bag of marijuana and a small bag of a brown substance that proved to be heroin. (Def. Ex. C at 2.)

Defendant was handcuffed with his hands behind his back, and placed in the back of Haas's and Harrelson's squad car, which had been moved to the alley. When Defendant complained he was claustrophobic and hot, he was allowed some freedom of movement, including sitting with the door open and his legs outside or standing.

Officer Amy Schuman, who had also responded to Haas's call for assistance, saw Defendant lean against the squad car and, with his hands in his hip area, make a "strange shaking motion." Then she saw a baggie containing smaller baggies that held a green leafy substance and a tan powdery substance fall to the ground. The substances tested positive for marijuana and heroin. Schuman believes that these bags were dropped by Defendant because she had previously checked the area for weapons and had not seen the baggies. After Defendant's odd shaking behavior, the drugs were on the ground at his

---

must arrest the violator. It usually takes ten minutes or so to confirm the existence of a valid order. Eventually, the officers found out that the order had not been served on Defendant, so the no contact order was not a valid reason to further detain Defendant.

feet. Otis also saw Defendant drop the drugs on the ground and heard them land. Otis's report stated that Defendant "reached down inside his boxer shorts and pulled out the bag and dropped it on the ground."

All of the officers testified, and the recordings of the encounter corroborates, that the entire encounter was relatively non-confrontational and low key. All passengers were cooperative, and none of the officers pulled their firearms or employed their cars' flashing lights or sirens.

Defendant was indicted for Possession with Intent to Distribute a Controlled Substance Within 1000 Feet of a School in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(c), and 860. Defendant seeks to exclude evidence resulting from the August 4, 2018 search, which he contends violated his Fourth Amendment right to protection against unreasonable searches and seizures.

## II. ANALYSIS

### A.  *The Parties' Arguments*

Defendant argues that the stop on August 4 was an ordinary *Terry* stop under *Terry v. Ohio*, 392 U.S. 1, 9 (1968), rather than a traffic stop, because it occurred on private property and not on a public roadway. He argues that after Officers Haas and Harrelson learned that the noise did not come from inside the residence or the car they had no more reason to continue questioning the occupants of the car. Defendant also relies on the fact Haas's audio recording does not begin until 20-30 seconds after he first engaged Defendant and his companions. Defendant contends Haas had the opportunity to smell marijuana before Harrelson and Otis arrived; since Haas did not smell marijuana, he had no reason to seize Defendant. Defendant asserts that he was seized before any officer had individualized suspicion that he was involved in criminal activity.

The Government counters that Defendant was not seized until Otis told him to step out of the vehicle after seeing drugs under Defendant's seat. It further argues that Otis's

6

search of the front passenger compartment of the car and the seizure of the drugs were legal because they were supported by suspicion beyond the original noise complaint—specifically, the suspicion that surrounded Otis's discovery of marijuana near Defendant's car seat. The Government insists that this encounter must be treated as a traffic stop. Because it was a traffic stop, the Government contends, Haas and the other officers had the right to detain Jenkins and all his passengers as long as necessary to be sure that Jenkins was not driving illegally.

## B. *The detention, search, and seizures were constitutional.*

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted). Nevertheless, not all interactions between law enforcement and citizens are seizures. *See United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005). A citizen who is free to ignore the police and go about his business is not "seized" for purposes of the Fourth Amendment. *United States v. Cook*, 842 F.3d 597, 600 (8th Cir. 2016) (citations omitted). A person is seized only when officers by means of physical force or some show of authority in some way restrain a citizen's liberty. *Id.* Accordingly, even when officers have no basis for suspecting a particular individual of criminal activity, they may ask the individual questions and request to see identification. *United States v. Stewart*, 631 F.3d 453, 456 (8th Cir. 2011) (citation omitted).

Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *Arvizu*, 534 U.S. at 273; *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal

wrongdoing before a stop can be justified. *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417). A hunch does not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry*, 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir.2004)).

Whether a stop is a *Terry* stop or a traffic stop, the constitutionally acceptable length of the seizure of the individuals involved is determined by the seizure's "mission." *See Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted) (discussing traffic stops); *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (discussing *Terry* stops); *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001) (discussing traffic stops); *United States v. Johnson*, No. CR05-4063-MWB, 2005 WL 2704892, at *10 (N.D. Iowa Oct. 20, 2005) (citing *United States v. Leshuk,* 65 F.3d 1105, 1109 (4th Cir.1995)) (discussing *Terry* stops). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

### i. *The stop was a traffic stop.*

In the context of a traffic stop, all passengers in a vehicle are seized whenever officers detain the driver to investigate a vehicular violation. *Arizona v. Johnson,* 555 U.S. 323, 327 (2009) (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007)); *United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009) ("*Y. Sanchez*"). Passengers have as great a motivation as drivers to avoid apprehension for a crime during a traffic stop, and to employ violent means to do so, therefore the slight intrusion of a seizure without

8

particularized suspicion of wrong-doing is minimal, especially since the vehicle is already stopped. *Johnson*, 555 U.S. at 331-32. A lawful investigatory stop occurs under *Terry* whenever a vehicle and its occupants are lawfully detained to investigate a vehicular violation. *Id.* at 327. The police need not have, in addition, cause to believe that anyone in the vehicle is involved in criminal activity to conduct a traffic stop. *Id.* (explaining that the vehicle at issue was originally stopped for an insurance violation, an infraction of civil law that would result in the issuance of a citation).

During a traffic stop, an officer may check a driver's license and registration, ask his destination and purpose, and ask him to step out of the car. *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir. 2002). The officer may "undertake similar questioning" of the vehicle's occupants to verify the information supplied by the driver. *Id.* (citation omitted). While a vehicle is stopped, officers may extend inquiries into matters unrelated to the traffic stop, as long as doing so does not "measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333.

What length of stop and investigation is necessary will vary based on the circumstances of each case. But once an officer has determined whether a driver has a valid license and any outstanding warrants, the purposes of a traffic stop, which are road safety and safe vehicular operation, are usually accomplished. *Jones*, 269 F.3d at 925, 929. If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) ("*O. Sanchez*") (quotations omitted).

In this case, the original reason Officers Haas and Harrelson were dispatched to the residence was to address a noise complaint. The noise stopped before the officers arrived. The initial reason for their presence at the residence had nothing to do with traffic safety. Once officers asked the occupants of the car if they knew anything about

9

noise in the area, and learned that they did not, the purpose of the stop was complete. Defendant would have the Court end its inquiry there and, indeed, Haas and Harrelson could have done so.

After his original mission was complete, however, Haas was entitled to request identification from the occupants of the car without turning the encounter into a seizure, and he chose to do so. *See Stewart*, 631 F.3d at 456. At this juncture, Haas was alone and had not taken any action that could conceivably constitute a show of force. Defendant had not attempted to exit the car, and Haas had not spoken to him. Jenkins and his passengers apparently consented to answer Haas's questions about their purpose for being in the driveway. The tone of the entire encounter was low key and conciliatory, and certainly the beginning of the recording has a casual and conversational tone. (Gov. Ex. 1 (Mic.1).)

Jenkins told Haas that he did not have a valid driver's license, but had driven to his current location, and that he was there to pick up someone. This indicated that he intended to continue on his way, rather than end his trip at the house. At this point, Haas's suspicions were aroused that Jenkins was violating Iowa traffic laws because he was driving without a license. *See* Iowa Code §§ 321.218(1) (driver who does not have a valid driver's license commits a simple misdemeanor); 321.485(1)(a) (officer may immediately arrest person if officer has "reasonable cause" to believe person violated any provision of chapter relating to motor vehicle offenses punishable as, among other things, a simple misdemeanor). This suspicion allowed Haas to prolong the encounter with Jenkins and to temporarily seize Jenkins until his identity could be verified.

The Parties dispute when Defendant was seized. Defendant makes much of what he calls the officers' "show of force" and whether a reasonable person would find such behavior sufficient to believe he was detained. Conversely, the Government argues that the encounter was consensual, congenial and, therefore, that Defendant was not seized

until Otis ordered Defendant out of the car. Notwithstanding this argument, the Government also argues that this stop was a traffic stop. It is clear, however, that Defendant was seized when Haas directed Defendant to stay in the car. Although phrased as a request, the circumstances and the testimony of Haas make clear it was an order. Haas testified, "If he walked away, I would have told him to stop." (Oct. 12, 2018 Cross Exam. Test. Alexander Haas at 9:32:31 a.m.) Counsel for the Government essentially acknowledged Defendant was ordered to stay in the car when she asked Officer Haas the following question:

> Q. Now, prior to the discovery of any drugs on this defendant, other than the indication you gave earlier where you gave the direction for this defendant to stay in the vehicle, did you order him to do anything else?
> A. No.

(Oct. 12, 2018 Direct Exam. Test. Alexander Haas at 9:21:57-9:22:09 a.m.)

The Parties also dispute whether the officers could effect a "traffic stop" where the officers were on foot and could not prevent the vehicle from driving off. The facts, however, show that the officers did manage to engage the occupants of the vehicle and prevent them from driving away as effectively as the more usual roadside stop. Because the officers treated it as a traffic stop and ordered the passengers to remain inside, it was, in effect, a traffic stop. As such, all passengers were seized for Fourth Amendment purposes once Jenkins was seized so that Haas could investigate Jenkins's license violation. The Government admits that at the point when Haas began questioning Jenkins about his driver's license, Haas treated the encounter as a traffic stop. This was the point at which all the occupants of the car, including Defendant, were seized. *See Y. Sanchez*, 572 F.3d at 478; s*ee also Johnson*, 555 U.S. at 333 (reasoning that a traffic stop "communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will").

11

The fact that the officers approached a parked vehicle on foot, makes this encounter somewhat atypical. Nevertheless, the concerns at the heart of *Johnson* remain, and Haas lawfully "exercise[d] unquestioned command of the situation" to minimize any risk to officers and passengers, alike. *See Maryland v. Wilson,* 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)); *Johnson*, 555 U.S. at 330–31. Furthermore, in this situation, there was even less of a "minimal intrusion" to the passengers subjected to the traffic stop because Jenkins's car was already parked and an on-going trip was not interrupted. *See Maryland*, 519 U.S. at 415 (recognizing only minimal intrusion to passengers who were already stopped "by virtue of the stop of the vehicle"); *Johnson*, 555 U.S. at 331 (recognizing the "legitimate and weighty" interest in officer safety that outweighs the *de minimus* intrusion on passengers of allowing officers to control the situation during a traffic stop) (citing *Maryland*, 519 U.S. at 415) (emphasis in original).

Here, I can discern no reason to be less concerned about safety merely because the officers approached the vehicle on foot, rather than pulling it to the side of a highway. By the same token, there is no greater imposition on the passengers of this parked car, than if they were stopped by the highway. Moreover, under *Johnson*, Haas could lawfully seize Defendant and the other passengers while he sorted out Jenkins's licensure status, and the other officers could make inquiries into other issues while waiting for Haas to finish his license search, as long as doing so did not "measurably extend the duration of the stop." 555 U.S. at 333. Other than asking about weapons, which directly relates to officer safety during a traffic stop, the officers only asked about the noise complaint and the no contact order.

The recordings of the encounter document that Haas tried to find Jenkins in databases in both Illinois (Jenkins's state of residence) and Iowa. Haas tried several times to follow up with dispatch, and no one seemed able to verify Jenkins's identity by his

social security number or the other identifying information Jenkins provided. This process went on for a total of 53 minutes out of an approximately 68-minute encounter.[6] Ultimately, it appears that Haas simply took Jenkins's word for his criminal history and terminated the stop.[7]

In conclusion, because Haas was justified in seizing Jenkins and his passengers while he verified whether Jenkins violated Iowa traffic laws, the stop was a valid traffic stop.

> ii. *The search of the passenger area of the car and seizure of drugs was constitutional.*

While Haas was trying to clarify Jenkins's licensure status, Otis saw the marijuana under Defendant's seat, and the incriminating nature of the marijuana was immediately apparent to Otis. (Oct. 12, 2018 Direct Test. Benjamin Otis at 10:42:08 a.m.) Accordingly, Otis had the right to seize the marijuana without a warrant. *See Minnesota v. Dickerson*, 508 U.S. 366, 376-77 (1993); *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008). Moreover, because Otis saw the marijuana before the traffic stop was completed, the subsequent search of the front seat of the car was justified. *See United States v. Booker*, 269 F.3d 930, 932 (8th Cir. 2001) (holding that police officer who saw cannabis residue on floor of vehicle while trying to confirm validity of defendant's driver's license had probable cause to search vehicle). In fact, Otis took Defendant out of the car seven minutes and twenty-seven seconds after Defendant was first instructed by Haas to get back in the car at the beginning of the traffic stop. The traffic stop went on for approximately 50 more minutes. Importantly, the marijuana was in plain view in an automobile, and therefore Defendant had no reasonable expectation that it would be

---

[6] The recording is approximately 82 minutes. The last part mostly consists of the officers talking to each other. Jenkins and the back seat passengers have left by that time.

[7] There was considerable interference on Haas's microphone at that point, but it seemed Haas was never able to verify Jenkins's statements. (Gov. Ex. 1 at 9:43:50 (Mic.1).)

13

kept private. *See United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (reasoning that due to transparency of windows, there is no reasonable expectation of privacy in contents in plain view inside an automobile).

Finally, Defendant had "neither a property nor a possessory interest in the automobile" that conferred standing on him to challenge the search of the passenger compartment of the vehicle. *See United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (holding that automobile passenger lacked standing to challenge search of vehicle because he was not "an owner, registered user, or driver" of the vehicle).

Because the police contact (1) began as non-custodial questioning about the noise complaint and reasons for being at the residence; (2) became a minimally invasive traffic stop and seizure only when it was apparent that Jenkins might be violating traffic laws; and (3) became a search of the area around where Defendant was sitting only once the marijuana gave Otis individualized suspicion to suspect that the drugs belonged to Defendant, the search of the car was constitutional, and the drugs found in the car need not be suppressed. *See O. Sanchez*, 417 F.3d at 975; *Booker*, 269 F.3d at 932. The drugs that fell from Defendant's underwear were not a product of the search by the officers. Rather, Officer Schuman credibly testified that she discovered the drugs on the ground after Defendant's motions shook the drugs loose. Officer Otis also saw the drugs fall from Defendant's body, so these drugs, likewise, need not be suppressed.

### III. CONCLUSION

Accordingly, I find that Defendant's Fourth Amendment rights were not violated when the seizure was extended to a traffic stop after Haas completed his original mission of asking about the source of the noise complaint.

Therefore, **I respectfully recommend that Defendant's Motion to Suppress (Doc. 10) be DENIED.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 31st day of October, 2018.

_____
Mark A. Roberts
United States Magistrate Judge
Northern District of Iowa