# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> DEANDRE WARREN, <br><br> Defendant. | No. 18-CR-82-CJW-MAR <br><br> **ORDER** |

## I.  INTRODUCTION

This case is before the Court pursuant to defendant's Objections (Doc. 26) to the Report and Recommendation (Doc. 20) of the Honorable Mark A. Roberts, United States Magistrate Judge, in which Judge Roberts recommends that the Court deny defendant's motion to suppress evidence.  On September 19, 2018, defendant filed a Motion to Suppress.  (Doc. 10).  The government timely filed a resistance.  (Doc. 13).  On October 12, 2018, Judge Roberts held a hearing on defendant's motion.  On October 31, 2018, Judge Roberts issued his Report and Recommendation.  (Doc. 20).  On November 14, 2018, defendant timely filed the Objections.  (Doc. 26).[1]  For the following reasons, I overrule defendant's Objections, adopt in part and modify in part Judge Roberts' Report and Recommendation, and deny the Motion to Suppress.

## II.  STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which

---

[1] I note that on November 20, 2018, defendant entered a conditional guilty plea before Judge Roberts, which this Court accepted on December 5, 2018.  (Doc. 32).

objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* FED. R. CRIM. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, I review the disputed portions of the Report and Recommendation de novo.

### III.   FACTUAL BACKGROUND[2]

At approximately 8:40 p.m. on August 4, 2018, Cedar Rapids Police Officers Alexander Haas and Ryan Harrelson responded to an anonymous complaint about noise from inside a house located at 1032 9th Street S.E., Cedar Rapids ("the residence"). Officers had previously received information that there were some subjects with warrants staying at that residence, and Officer Haas had prior knowledge of other individuals having used narcotics at the residence.

The officers parked on 9th Street in front of the residence. When the officers arrived, all was quiet. Both officers were in uniform and wore utility belts that held, among other things, their firearms. Neither officer wore body cameras, although there

---

[2] After reviewing the Hearing Transcript (Doc. 31), I find that Judge Roberts accurately and thoroughly set forth the relevant facts in the Report and Recommendation. When relevant, I rely on and discuss additional facts in conjunction with my legal analysis.

2

were three cameras in their squad car that could pick up three different views of scenes, and microphones that picked up each officer's conversation. The microphones turn on automatically when the lights on top of the squad car are activated and they can be manually turned on at any time by the officers. The officers never activated the lights, however, during the events described below.

The officers testified that noise complaints are common, and it is not unusual for noises to cease by the time officers arrive. When that happens, the officers' usual procedure is to walk around the immediate area to look for the source of the noise. On this occasion, Officer Harrelson knocked on the front door of the residence to speak to the occupants, while Officer Haas went to the back of the residence to see if he could find the source of the noise.[3]

When Officer Haas entered the back yard alone, he saw a car parked in the driveway of the residence. Officer Haas thought the car might have been the source of the noise or might have been either arriving at, or leaving from, a party at the residence. The car was parked off the traveled portion of the alley, facing toward the residence and could not be driven away without backing up. Because it was dark,[4] and the car's headlights shone into Officer Haas's eyes, he could not see who was in the car.[5]

---

[3] Officer Harrelson spoke to an individual inside the residence who refused to open the door, but the individual denied making the noise complaint.

[4] The officers did not use identical terms in describing how dark it was when the relevant events occurred. Officer Haas testified that it was "dark" and that he was using his flashlight. Officer Harrelson testified that is was "dusk" and "getting dark," but that he could see with his flashlight. Officer Otis testified that it was "pitch black" and that he used his flashlight. Officer Schuman testified that she did not recall how dark it was. After viewing Exhibit 1 (the squad car recordings) and Exhibit B (photographs at the scene), I agree with Judge Roberts' conclusion that it was at least dusk at the beginning of the encounter, and quickly became fully dark. More importantly, I do not accept defendant's argument that Officer's Harrelson's use of the word "dusk" "goes to his credibility." (Doc. 26-1, at 1).

[5] It is not clear from the record whether the car was running at the time, although the fact that

3

Officer Haas approached the driver's side of the car and told the driver that officers were there because of a noise complaint. Officer Haas asked the people in the car what they were doing there. Officer Haas did not have his microphone turned on at this point, and this initial exchange was not recorded. Haas turned on his microphone 20-30 seconds after he first encountered the occupants of the car. Officer Haas testified that he "just did not think" of turning on his microphone at first.[6] Officer Haas's recording starts while he is asking the driver for identification. (Exhibit 1, at 8:51:00 (Mic. 1)).

The driver, Cedric Jenkins, told Officer Haas that he and his passengers had just arrived at the residence to pick up another person. Officer Haas asked the driver to identify himself, and the driver immediately replied that he had no driver's license or valid identification. Officer Haas asked the driver how he arrived at the residence, and the driver admitted that he had driven there. Officer Haas then asked the driver to step out of the car so he could continue to verify the driver's identification. Officer Haas testified that, at that point, he was treating his questioning of the driver as a "traffic stop" and was investigating whether the driver had illegally driven a car that night. Officer Haas dealt almost exclusively with the driver from this point on. Fifty-three minutes into the encounter, Officer Haas was still trying to verify the driver's identification. (*Id.*, at 9:43:50 (Mic. 1)).

Defendant Deandre Warren was in the front passenger seat and two women were in the back seat of the car. When Officer Haas told the driver to get out of the car,

---

its headlights were on would suggest that it was.

[6] Defendant argues that Officer Haas offered no explanation for not turning on his microphone and claims Officer Haas testified falsely when he said he turned on his microphone when he encountered the occupants of the car. (Doc. 26-1, at 3). Defendant argues that this detracts from Officer Haas's credibility. I disagree. I find Officer Haas' explanation reasonable and believable. It is important to note that the critical exchange with defendant was recorded. This is not a case, for example, of an officer claiming defendant gave consent or made incriminating statements that were not captured on a recording.

defendant also started to get out of the car. Officer Haas said, "Sir, can you just stay in there for me, please?" and defendant complied. (*Id.*, at 8:51:21 (Mic. 1)). Officer Haas then thanked defendant. Approximately 40 to 50 seconds passed between when Officer Haas first encountered the car and when he asked defendant to stay in the car.

Officer Haas informed the dispatcher that he was in the back of the residence with four subjects and requested officers to assist him. When Officer Harrelson heard Officer Haas's call, he walked to the back of the residence to assist. Officer Harrelson stood by the rear passenger-side door of the car because that position gave him a good view of the whole car. When Officer Harrelson arrived, he noticed a "faint odor of marijuana emanating from the vehicle."[7] (Doc. 24, at 49). Officer Harrelson then explained to the passengers in the car that he and Officer Haas were responding to a noise complaint. People in the car started smoking cigarettes, which, based on his training and experience, Officer Harrelson believed was done to mask the odor of marijuana. Officer Harrelson began identifying the passengers. Officer Benjamin Otis arrived at the scene less than two minutes after Officer Harrelson and began speaking to defendant.[8] (*Id.*, at 8:52:19-8:54:05 (Mic.1)). Officer Otis stood by defendant's door and spoke to him through the open window.

---

[7] Officer Haas never smelled marijuana coming from the car but explained that he had a cold that night. Defendant suggests that because Officer Haas said this only on redirect examination, the Court should conclude that it was not true. There is no basis for me to reach that conclusion.

[8] Around this time, Officers Harrelson and Haas became aware from dispatch that there was a no-contact order between defendant and one of the woman in the back seat. When officers become aware that someone might be violating such an order, they are required to hold that person until they can confirm that a violation is occurring. If the person is in violation of the order, officers must arrest the violator. It usually takes ten minutes or so to confirm the existence of a valid order. Eventually, the officers found out that the order had not been served on defendant, but it is not clear on the record when this occurred. Officers would have been justified in detaining defendant from the time they learned of the restraining order until such time they determined defendant had not been served with the order.

Officer Otis did not smell marijuana, but did smell cigarette smoke. Officer Otis testified that in his training and experience he also believed people sometimes try to mask the odor of marijuana by smoking cigarettes. Officer Otis found defendant to be cooperative, but nervous. Officer Otis allowed defendant to reach into the glove compartment for a cigarette. However, when defendant appeared to reach under his left leg, Officer Otis shined his flashlight on defendant's hands, and defendant stopped this motion. Officer Otis then shined his flashlight down the inside of the front passenger door and saw a bag of marijuana sticking out from under the passenger seat. Defendant was then removed from the car approximately seven-and-half minutes after Officer Haas told him to stay in the car. (*Id.* at 8:58:48 (Mic. 2)). The area around where defendant had been sitting was searched. The officers confirmed that the bag under the seat contained marijuana. Officers also found another bag of marijuana and a small bag of a brown substance that later proved to be heroin. (Doc. 17-2, at 2).

Defendant was handcuffed with his hands behind his back and placed in the back of Officers Haas and Harrelson's squad car, which had been moved to the alley. When defendant complained he was claustrophobic and hot, he was allowed some freedom of movement, including sitting with the door open and his legs outside, or standing.

Officer Amy Schuman, who had also responded to Officer Haas' call for assistance, saw defendant lean against the squad car and, with his hands in his hip area, make a "strange shaking motion." Then she saw a baggie containing smaller baggies that held a green leafy substance and a tan powdery substance fall to the ground. The substances tested positive for marijuana and heroin. Officer Schuman believes that defendant dropped these bags because she had previously checked the area for weapons and had not seen the baggies. After defendant's odd shaking behavior, the drugs were on the ground at his feet. Officer Otis also saw defendant drop the drugs on the ground and heard them land. Officer Otis' report stated that defendant "reached down inside

his boxer shorts and pulled out the bag and dropped it on the ground." (Doc. 24, at 111).

All of the officers testified, and the recordings of the encounter corroborate, that the entire encounter was relatively non-confrontational and low key. All passengers were cooperative, and none of the officers displayed their firearms or employed their cars' flashing lights or sirens.

A grand jury indicted defendant, charging him with Possession with Intent to Distribute a Controlled Substance Within 1000 Feet of a School in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c), and 860. Defendant seeks to exclude evidence resulting from the August 4, 2018 search, which he contends violated his Fourth Amendment right to protection against unreasonable searches and seizures.

## IV. ANALYSIS

In the Motion to Suppress, defendant argues that the officers lacked reasonable suspicion to detain him and that the controlled substances must, therefore, be suppressed as the fruit of an unlawful seizure. (Doc. 10-1, at 3-5). Defendant argues that Officer Haas seized him, in violation of the Fourth Amendment, when Officer Haas asked defendant not to get out of the car. Judge Roberts found that the encounter with defendant was part of a traffic stop, that Officer Haas had reasonable suspicion that the driver had committed a traffic offense, and that Officer Haas was justified in seizing defendant, as a passenger of the car, while Officer Haas investigated a possible traffic violation. (Doc. 20, at 8-13). Judge Roberts additionally found that Officer Otis saw marijuana in plain view at defendant's feet inside the car and therefore lawfully seized the marijuana and arrested defendant. (*Id.*, at 13-14).

Defendant argues that Judge Roberts erred in concluding that the officers' interaction with defendant was part of a traffic stop. (Doc. 26-1, at 2-3). Defendant argues that Officer Haas' request that defendant remain in the car was a command that

constituted a seizure. (*Id.*). Defendant argues that Officer Haas did not have a reasonable, articulable basis to believe that defendant was involved in criminal activity and therefore violated defendant's Fourth Amendment right by seizing him. (*Id.*). Defendant also argues that Officer Otis could not have seen the marijuana in plain view. (*Id.*, at 4).

### A. *The Officers' Encounter with Defendant*

The question of whether officers violated defendant's constitutional rights by seizing him turns on resolving two issues. The first issue is whether Officer Haas seized defendant when he asked defendant not to get out of the car. If I find that this was a seizure, the issue then becomes whether Officer Haas could lawfully seize defendant under these circumstances. I find, however, that Officer Haas' request that defendant not get out of the car was not a seizure. Nevertheless, I alternatively find that Officer Haas could lawfully detain defendant under the circumstances.

#### 1. *Officer Haas Did Not Seize Defendant*

Not all encounters between law enforcement and citizens implicate the Fourth Amendment. "The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security[.]" *Maryland v. Wilson*, 519 U.S. 408, 411 (1997) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977)). A person is seized within the meaning of the Fourth Amendment "when the officer, by means of physical force or show of authority, terminates or restrains [the person']s freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations omitted). Under this standard, "a seizure does not occur simply because a police officer approaches an individual and asks a few

questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). *See also Michigan v. Chesternut*, 486 U.S. 567, 574 (1988) (holding that the test for whether a person has been "seized" within the meaning of the Fourth Amendment is an "objective standard" that looks to whether a reasonable person would have believed that he was not free to leave); *INS v. Delgado*, 466 U.S. 210, 215 (1984) (holding that a seizure occurs "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

A "consensual" encounter between law enforcement and a citizen triggers no Fourth Amendment scrutiny. *See Bostick*, 501 U.S. at 434. Whether an encounter is "consensual" is simply the inverse of the objective standard for existence of a seizure: "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual, and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434 (internal quotation omitted). "The determination whether an encounter is consensual depends upon the unique factual nature of each case," and thus requires consideration of "all the circumstances." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007). *See also United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012) (in determining whether an encounter between an officer and a person is consensual, courts consider the totality of the circumstances). The Eighth Circuit Court of Appeals has identified seven non-exclusive factors when examining the totality of the circumstances, which include:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (internal citations omitted).

In this case, when Officer Haas approached the car in which defendant was sitting, he had consensual contact with the driver and passengers. He was alone. He stood on the driver's side of the car, not on the passenger's side where defendant was seated. No vehicle blocked the vehicle defendant was in. Although Officer Haas was armed, he did not display his weapon and it remained holstered. Officer Haas never touched defendant, retained any of defendant's property, or indicated to defendant that defendant was the focus of his investigation.

When Officer Haas learned that the driver did not have a driver's license, Officer Haas had reasonable suspicion to believe that the driver had committed a traffic violation by driving to the residence. Thus, Officer Haas could lawfully detain the driver to further investigate this crime and ask the driver to step out of the car. Defendant does not argue that Officer Haas violated his constitutional right up to this point. Rather, defendant argues that Officer Haas seized him in violation of the Fourth Amendment when defendant started to get out of the car and Officer Haas asked him to stay in the car. (Doc. 26-1, at 3).

Defendant argues, and Judge Roberts agreed, that Officer Haas ordered defendant to remain in the car and therefore seized him. Judge Roberts found that:

> Although phrased as a request, the circumstances and the testimony of Haas make clear it was an order. Haas testified, "If he walked away, I would have told him to stop." (Oct. 12, 2018 Cross Exam. Test. Alexander Haas at 9:32:31 a.m.) Counsel for the Government essentially acknowledged Defendant was ordered to stay in the car when she asked Officer Haas the following question:
>
>> Q. Now, prior to the discovery of any drugs on this defendant, other than the indication you gave earlier where you gave the direction for this defendant to stay in the vehicle, did you order him to do anything else?

A. No.

(Doc. 20, at 11). I respectfully cannot agree.

An officer's use of language or tone indicating that compliance might be compelled can indicate a seizure. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). But there is "a constitutionally significant distinction between an official command and a request that may be refused." *United States v. Vera*, 457 F.3d 831, 835 (8th Cir. 2006). Not every direction by an officer constitutes a seizure. *See United States v. Valle Cruz*, 452 F.3d 698, 706 (8th Cir. 2006) (holding that officer's statement to "sit tight," "when taken in context," did not effect a seizure). In this case, Officer Haas asked defendant to stay in the car. Officer Haas asked: "Sir, can you just stay in there for me, please?" (Exhibit 1, at 8:51:21 (Mic. 1)). This was a request, and not a command. Officer Haas spoke to defendant with respect, using the honorific "sir," and said "please." When defendant complied, Officer Haas thanked him. Officer Haas's voice was polite, calm, and at a normal volume and tone.

That defendant complied with the request does not convert the request into a command. Nor does the fact that Officer Haas testified that he would have stopped defendant had defendant not complied with his request transform his request into a command. Defendant did comply with the request. Officer Haas did not issue a command. Nor am I persuaded that the prosecutor's use of the word "direction" constitutes a concession that the request constituted a command and not a request. In any event, the Court is not bound to accept the concession if it was one.

Therefore, I find that defendant was not seized when Officer Haas requested that he remain in the car. In a consensual encounter, Officer Haas asked defendant to remain seated and defendant consented to do so.

### 2. *Alternatively, Officer Haas Lawfully Detained Defendant*

Alternatively, I find that Officer Haas could briefly detain defendant while

11

conducting a *Terry* stop of the driver. Officers may stop or detain a person if there is a reasonable, articulable suspicion that he or she has or is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). A court "assess[es] whether a law enforcement official had reasonable suspicion of criminal activity based on the totality of the circumstances." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017). "Reasonable suspicion exists when an officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citations and internal quotation marks omitted). In this case, defendant does not dispute that, when the driver told Officer Haas he did not have a valid driver's license, Officer Haas had a reasonable, articulable basis to detain the driver and investigate the possible criminal violation of a traffic law.

Nor does defendant allege the scope of the *Terry* stop of the driver in this case was improper. The scope of a *Terry* stop is limited and "may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) (internal quotation omitted). In determining whether a detention is too long to be justified as a *Terry* stop, courts consider whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). There is no bright line rule; instead, "common sense and ordinary human experience must govern over rigid criteria." *Id.* at 685. In this case, Office Haas actively pursued the investigation of whether the driver committed a driving violation, and that investigation legitimately continued beyond the point in time when officers arrested defendant for possession of the controlled substances.

There is also no question that at the time Officer Haas requested defendant to remain in the car that Officer Haas did not have a reasonable, articulable basis to believe

that defendant himself was engaged in criminal conduct. An officer must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity" in light of all the circumstances from which "a trained officer draws inferences and makes deductions . . . that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Thus, assuming for the sake of argument that Officer Haas' request that defendant remain in the car constituted a seizure, that seizure cannot be justified as a proper *Terry* stop of defendant based on his own conduct. The analysis does not, however, end there.

Although officers should employ the least intrusive means reasonably available to verify or dispel their suspicions during a *Terry* stop, *see Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion), officers may take any additional steps that are "reasonably necessary to protect their personal safety . . . during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). This includes the authority to briefly detain other people while the officers are otherwise engaged in the *Terry* stop of another person. In *Michigan v. Summers*, the Supreme Court ruled that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981) (footnotes omitted). In *Summers*, police approaching a house to execute a search warrant saw the owner of the house leaving and detained him for the duration of the search. *Id*. at 693. The Court reasoned that the detention was permissible because it involved a limited detention at the individual's own residence, was not very intrusive, and served several important police interests. The Court concluded that detaining such individuals prevented flight, minimized the risk of harm to officers and others, and facilitated the orderly completion of the search. *Id*. at 702–03. In *Bailey v. United States*, the Supreme Court noted that the categorical "rule in *Summers* extends farther than some earlier exceptions because it does not require law enforcement to have

particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers" in order to briefly detain an individual. 568 U.S. 186, 193 (2013).

Courts have applied the reasoning of *Summers* to settings other than the execution of search warrants. *See, e.g., United States v. Clark*, 337 F.3d 1282, 1288 (11th Cir. 2003) (detention of persons watching a street fight was not unreasonable even though the officer did not have any suspicion of criminal activity on the part of the noncombatants); *Gomez v. United States*, 601 Fed. App'x 841, 847-48 (11th Cir. 2015) (finding that temporary detention of father during arrest of son did not constitute an unlawful seizure under the Fourth Amendment); *United States v. Enslin*, 327 F.3d 788, 797 n.32 (9th Cir. 2003) (noting that *Summers* applies in the context of arrest as well as search warrants); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (stating that "officers act within their *Summers* powers when they detain an individual who approaches a property being searched pursuant to a warrant, pauses at the property line, and flees when the officers instruct him to get down"); *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995) ("The governmental interest in securing the area around [an arrestee] and protecting officers from potential danger is sufficient to justify the temporary detention of [of a bystander and her son].") (citation omitted). *See also Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (stating in dictum that "the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant").

If an officer briefly detains an individual, the relevant constitutional inquiry is whether the governmental interest is reasonable when balanced against the individual's right to be free from government intrusion and the nature of that intrusion. *Wilson*, 519 U.S. at 414-15. Officer safety is a "legitimate and weighty" governmental interest. *Mimms*, 434 U.S. at 110. When considering the importance of officer safety in the

context of executing a search warrant, the Supreme Court concluded that "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers*, 452 U.S. at 702-03. In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court similarly noted the danger inherent in a *Terry* stop like the one in this case that exists before any arrest has been made.

> [A] *Terry* investigation . . . involves a police investigation at close range, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger.

463 U.S. at 1052 (emphasis in original) (internal citations omitted).

In this case, Officer Haas had a legitimate concern for his safety. At the time he asked defendant to remain in the car, he was alone in an alley having contact with four individuals in a car. It was nighttime and dark. He was behind a residence known to officers to be associated with people with warrants and involved in narcotics. And Officer Haas had just removed the driver from the car when he asked defendant to remain seated. Balanced against Officer Haas' legitimate safety concerns, the nature and duration of defendant's detention was minimal. Officer Haas did not touch defendant or use any force or display of force against him. Officer Haas did not move defendant, change defendant's location, or physically restrain defendant. Rather, by his request that defendant remain seated, Officer Haas merely maintained the status quo. The duration of defendant's detention (between the time of Office Haas' request and the time that Officer Otis saw the marijuana and removed defendant from the car) was short—approximately seven minutes. Defendant thereafter did not request to leave or attempt to get out of the car and officers took no other measures to restrict his movements.

Given the totality of the circumstances, and with the Fourth Amendment touchstone of reasonableness in mind, I find that Officer Haas did not unreasonably detain defendant when he asked defendant to remain seated while conducting a *Terry* stop of the

driver. Officer Haas' minimal and short restriction of defendant's freedom of movement by maintaining the status quo was necessary and justified under the circumstances. Therefore, I find that even if Officer Haas detained defendant as a result of his request that defendant remain seated in the car, that detention did not violate defendant's Fourth Amendment right.

### 3. *Detention in Connection With a Traffic Stop*

Judge Roberts analyzed the detention of defendant under the case law involving traffic stops. (Doc. 20, at 8-13). Judge Roberts found that, even though officers did not stop the car for a traffic violation, the stop was effectively a traffic stop because officers engaged the people while they were in a vehicle and officers treated it as a traffic stop. (*Id.*, at 11). Defendant takes issue with this, arguing that it was not a traffic stop. (Doc. 26-1, at 2-4). Defendant argues that "[j]ust because Officer Haas testified that he was treating the situation as a 'traffic stop' does not make it a traffic stop." (*Id.*, at 2).

Assuming this was a traffic stop, Judge Roberts correctly analyzed the law regarding *Terry* stops during traffic stops. (Doc. 20, at 8-10). Judge Roberts correctly noted that officers have the right to detain all occupants of a vehicle during a traffic stop while investigating the crime connected with the traffic stop. (*Id.*). Pursuant to this analysis, Judge Roberts properly concluded that the temporary detention of defendant during the traffic stop did not violate his Fourth Amendment rights.

I find that whether this case is analyzed under the case law pertaining to traffic stops or not does not change the outcome of the case. As discussed in the prior section, Officer Haas' brief detention of defendant as a bystander was appropriate under the circumstances for purposes of officer safety while Officer Haas was conducting a *Terry* stop of the driver. That analysis would be the same whether Officer Haas had encountered the defendant and the others in a garage behind the house instead of a car behind the house. The concern for officer safety is similar in either circumstance. I

also agree with Judge Roberts that I "can discern no reason to be less concerned about safety merely because the officers approached the vehicle on foot, rather than pulling it to the side of a highway." (Doc. 20, at 12).

Therefore, I find that officers did not violate defendant's Fourth Amendment rights by briefly detaining him while Office Haas investigated whether the driver committed a traffic offense, whether this case is analyzed as a traffic stop or not.

### B. *The Seizure of the Drugs*

Defendant argues that Judge Roberts erred when he found that the search of the passenger compartment of the vehicle was constitutional. (Doc. 26-1, at 4). Defendant disputes the veracity of Officer Harrelson's claim that he smelled marijuana (*Id.*, at 1, 3), and argues that Officer Otis could not have seen the marijuana at defendant's feet as he claimed he did (*Id.*, at 4). Judge Roberts credited the officers' testimony and found that once Officer Otis saw the marijuana in plain view, he had the lawful authority to seize it. (Doc. 20, at 13-14).

Upon my own review of the record, I agree with Judge Roberts' findings. Officer Harrelson testified that he faintly smelled marijuana when he first approached the car. Officer Haas did not smell marijuana, but he had a cold. Officer Otis did not smell marijuana, but by the time he arrived defendant and the female passengers had started smoking cigarettes, conduct which the officers testified was a common means for people to attempt to cover up marijuana odors. I find the officers' testimony to be credible. The minute Officer Harrelson smelled marijuana, it created probable cause to search the car. *See United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989) (smell of burnt marijuana created probable cause for vehicle search). Nevertheless, Officer Harrelson did not immediately search the car. Therefore, whether he smelled marijuana at the time or not becomes immaterial.

When Officer Otis arrived, he engaged in a conversation with defendant while

Officer Otis was standing by defendant's door. When defendant began to reach toward his leg, Officer Otis shined his flashlight at defendant's hands. Although defendant then stopped his movement, Officer Otis shined his flashlight down inside of the front passenger door, at which point Officer Otis saw a bag of marijuana partially under the seat. Defendant argues this could not have happened, and points to Exhibit C, a photograph of the baggies of marijuana partially under the seat. Based on this photograph, defendant argues that "it is not reasonable to believe that Officer Otis could see the marijuana that was partially under the seat with the door closed and with [defendant] seated in the passenger seat." (Doc. 26-1, at 4).

Defendant made this same argument to Judge Roberts, who was not persuaded. Neither am I. Officer Otis testified he saw the marijuana and, defendant's speculation aside, there is no reason to discredit that testimony. The photograph that is Exhibit C was not taken with the car door closed and a flashlight shining down on it. It does not depict what Officer Otis saw from the angle at which he saw it. Therefore, I cannot view Exhibit C and definitively reject the officer's testimony that he saw the baggie of marijuana. Moreover, the fact that officers then removed defendant from the car and searched the car lends credence to Officer Otis' testimony that he saw something he believed to be illegal drugs.

Once I credit Officer Otis' testimony that he saw a baggie of something he believed to be drugs in plain view, it follows that he had the authority to seize the evidence without a warrant. *Minnesota v. Dickerson*, 508 U.S. 366, 376-77 (1993); *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008). Indeed, as previously noted, the officers had the constitutional authority to search the car the minute Officer Harrelson smelled marijuana emanating from the vehicle.

I also agree with Judge Roberts' alternative finding that defendant did not have standing to challenge the constitutionality of the search of the car. (*See* Doc. 20, at 14).

"Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *Rakas v. Illinois*, 439 U.S. 128, 148 (1978)). "The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995)). In this case, defendant has not asserted any property or possessory interest in the automobile, and the record is devoid of any facts that would indicate he has standing to challenge the search.

Therefore, I find that the search of the car did not violate defendant's Fourth Amendment rights. Having found neither defendant's detention, nor the search of the car, to be unlawful, there is no basis for challenging the admissibility of the other drugs seized from defendant during his arrest.

## V. CONCLUSION

For the reasons set forth above, defendant's Objections (Doc. 26) are **overruled** and the Report and Recommendation (Doc. 20) is **adopted in part and modified in part**, and defendant's Motion to Suppress (Doc. 10) is **denied**.

**IT IS SO ORDERED** this 15th day of January, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa